IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | | |
|---|---|---|
| Shauntell Burton, Benny D. Cheatham, Robert Douglass, Douglas Fender, and Dena Fender and on behalf of those similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C/A NO.: 7:24-cv-01800-JDA |
| vs. | ) ) | COMPLAINT |
| Bluefield Realty Group, LLC, Allen Tate Real Estate, LLC, McClendon Realty LLC, Grand Strand Homes and Land Realty LLC, S.H. June & Associates, LLC, Duncan Group Properties, LLC, Matt O'Neill Real Estate, LLC The Cassina Group, LLC, William Means Real Estate L.L.C., Carolina One Edisto, LLC, Carriage Properties, L.L.C., LPT Realty, LLC, Jeff Cook Enterprises, LLC Silver Star Real Estate LLC, Clardy Real Estate Inc., Axcent Real Estate LLC, Great Homes of South Carolina, LLC, Carolina Real Estate Company, LLC, Meybohm Realty, Inc., Carolina Realty of the Low Country LLC, Ballenger Realty, LLC, Low Country Real Estate of Beaufort, Inc., Advantage Realty Group, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |

```
Inc., Lake Homes Realty, )
LLC, Jackson Stanley    )
Realtors LLC, BlackStream)
International Real      )
Estate LLC, Charter One )
Realty & Marketing      )
Beaufort, LLC, Charter  )
One Realty & Marketing  )
Gateway, LLC, Charter One)
Realty & Marketing North,)
LLC, The Ponce Realty   )
Group LLC, Encore Realty )
LLC, Marchant Real      )
Estate, Inc., The Art of )
Real Estate LLC, Wolfe & )
Taylor, Inc., eXp World )
Holdings, Inc., Home    )
Services of America,    )
Inc., HSF Affiliates,   )
LLC, Weichert Co., Hanna )
Holdings, Inc., Realty  )
ONE Group Affiliates,   )
Inc., At World          )
Properties, LLC d/b/a At )
Properties Christie's   )
International Real      )
Estate, Inc., Litchfield )
Company Real Estate, LLC,)
Graham Realty, Inc.,    )
Del-Co Realty Group,    )
Inc., The Boulevard     )
Realty Company, Inc.,   )
The HomesFinder Realty  )
Group, LLC, REsides,    )
Inc., Home & Land Pro's )
LLC, C. Dan Joyner Co., )
Inc., C. Dan Joyner     )
Enterprises, Inc.,      )
Cambridge Realty, Inc.  )
and Weichert Beaufort LLC)
d/b/a Weichert-Coastal  )
Properties, and Fathom  )
Realty Holdings, LLC,   )
                        )
         Defendants.    )
```

The Plaintiffs, complaining of the Defendants, would

show unto the Court:

## NATURE OF ACTION

1.    Plaintiffs, home sellers who listed their homes in South Carolina on Multiple Home Listing Services ("MLS") in South Carolina, brings this action on their own behalf and on behalf of all others similarly situated against Defendants for agreeing, combining, and conspiring to impose and enforce an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of federal antitrust law.

2.    Defendants are a number of mid-sized and large real estate brokers and an MLS who have taken part in a conspiracy to fix prices at a breathtaking scope. Those real estate broker defendants are referred to as the Agency Defendants. There is also a Defendant that is a private, non-National Association of REALTORS Multiple Listing Service.

3.    Real estate brokers handle most residential real estate sales in the United States.  In a typical transaction, one broker will represent the seller, and another broker will represent the buyer of a home.  Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sales price.  Currently, total broker compensation in the United States is typically five to six percent of the home sales price, with approximately half of that

amount paid to the buyer broker.

4.    Real estate brokers generally do not specialize in either buyers or sellers and so are often the buyer broker in one transaction and the selling broker in another.

5.    The cornerstone of Defendants' conspiracy is NAR's adoption and implementation of a rule that requires all seller brokers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation (the "Adversary Commission Rule") when listing a property on a Multiple Listing Service. This rule is found on Page 39 of the NAR's Handbook on MLS Listing Policy. Those pages cited in this complaint are attached as Exhibit 1.

6.    An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS marketplace. Brokers, if they are members of an MLS, are required to list all properties on the MLS if that property is advertised for sale.

7.    The MLSs are generally controlled by local National Association of REALTORS (NAR) associations, and access to such MLSs is conditioned on brokers agreeing to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy. The Adversary Commission Rule is a mandatory rule in NAR's Handbook. Even those that are not controlled by the NAR directly must agree to certain conditions in order to allow their

homes to appear on other MLS searches, called broker reciprocity agreements. Those same MLSs are also required to follow similar rules because they are controlled by the REALTORS in the area.

8.    Agency Defendants and their co-conspirators collectively possess market power in local markets for real estate broker services through their control of the local MLS. They further exercise power through their positions on State and Local Boards or Associations of REALTORS. Those positions allow them to adopt the required Rules and Regulations, and to promulgate and exercise enforcement policies and procedures to ensure those Rules and Regulations are followed.

9.    Due to Defendants' conspiracy, NAR conditions a broker's access to and use of NAR's MLSs on a broker's agreement to adhere to and implement terms that restrain competition. Similarly, the State and Local boards of REALTORS, by and through the MLS boards, enforce and ensure the adherence to those terms that restrain competition.

10.    Each of the conspirators, to include the Agency Defendants, plays an active role in NAR and its state and local boards in South Carolina.

11.    Each of the Agency Defendants, as large and mid-sized brokers within the geographic areas that define each MLSs service area, their knowing acts of forming and/or joining and participating in the conspiracy, by implementing and enforcing

the conspiracy's rules and policies, is essential to the conspiracy's success.

12.    The unlawful restraints implemented and enforced by the conspirators benefit the Agency Defendants, furthering their common goals by permitting brokers to impose supra-competitive charges on home sellers and restrain competition by precluding competition from innovative or lower-priced alternatives.

13.    In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States. In markets not affected by any policy like the Adversary Commission Rule, buyer brokers are paid by home buyers and so are forced to compete to some extent on price and experience. According to the Executive Director of the Consumer Federation of America, total commission rates range "between 1% and 4%," whereas the typical total commission rate in the United States, a putatively free market economy, remain between 5% and 6%, which is no lower than it was in 2001 despite substantial increases in the value of homes and significant advances in technology.

14.    Even the NAR admits that United States commissions remain higher than other, similarly developed international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium.

15.   The Adversary Commission Rule, together with other anticompetitive rules imposed by the NAR and supported by the Agency Defendants, explains why commissions in the United States remain artificially and anticompetitively elevated beyond where they are in markets free from conspiracies like the Defendants'.

16.   Agency Defendants use their control of the MLSs – which they and other conspirators control – to require brokers in local residential real estate markets to adhere to NAR's rules, including the Adversary Commission Rule.

17.   The Agency Defendants and other conspirators further implement the conspiracy by reviewing NAR's Rules and agreeing to them at yearly meetings.

18.   NAR further advances the conspiracy by re-issuing its Rules (including the Adversary Commission Rule) every year, reaffirming these rules even after being put on notice of their anticompetitive effect.

19.   The Agency Defendants and their other conspirators participate in and implement the conspiracy by serving on boards and committees that enforce compliance with NAR rules through both "carrots and sticks."

20.   Through these actions, and others alleged in this Complaint, each of the Defendants has taken actions to further the conspiracy and thereby have agreed to join, participate in, facilitate, and implement the conspiracy.

21.   Defendants' conspiracy has kept buyer broker commissions in the 2.5% to 3.0% range for many years despite the diminishing role of buyer brokers. Many home buyers no longer search for prospective homes with the assistance of a broker, but rather independently through online services. Upon information and belief, NAR and the conspirators have studied and are aware of this trend and fact.

22.   Prospective home buyers increasingly retain a buyer broker after the client has already found the home a client wishes to purchase. Buyer broker commissions, however, have not fallen in recognition of this diminished role. Indeed, in real monetary terms, buyer broker commissions have increased because of the skyrocketing prices of homes, as they are calculated as a percentage of the home price.

23.   Defendants' success in maintaining the same artificially and anticompetitively inflated commission rates despite these technological and social changes starkly contrasts with results in other industries. The introduction of the internet and innovative discount service providers have provided enormous financial benefits to consumers of numerous goods and services in various sectors like travel booking, insurance, banking, stock brokering, and retailing.

24.   Transaction costs have dramatically decreased among a myriad of more poorly organized markets and prices in

those markets have mirrored that decline. Real estate sales have not because of the anticompetitive Adversary Commission Rule and the fact that listing agents today will be buyer brokers tomorrow.

25.   This market failure is best illustrated by the fact that a buyer broker's cost per house sold are roughly the same. However, that buyer broker's commission on a house that costs $2,500,000 is substantially higher than one that costs $250,000. In a rational market, given the costs to the buyer broker are roughly the same for each house sold, the percentage fee charged should decrease as the price increases. While the buyer broker may still receive a higher monetary fee for the purchase of the $2,500,000 house based on the home buyer's ability to pay, as a percentage fee, it would rationally be lower. Instead, due to the conspiracy and anticompetitive market manipulation and rent seeking, the commission structure overcharges sellers and has little relation to the quantity or quality of the buyer broker's services or the value the buyer broker serves.

26.   This structure further imposes agency costs on the buyer. Where a buyer broker's commission, to be paid by the seller, is set as a percentage of the home's sale price, the buyer broker is incentivized to harm her buyer in two ways.

27. The first is the practice of "steering." Given the

requirement that the listing agent make a blanket, unilateral offer of commission to buyer brokers, and the fact that these listing agents generally have an incentive to fit the commission to the "standard" commission available in the real estate market, buyer brokers face strong incentives to steer their buyer clients to higher priced homes to receive a higher real dollar commission.

28. The other is that a buyer broker has a strong incentive to negotiate the price of a house down to the highest amount he believes the buyer will pay.  He is further incentivized to add items to the contract that will placate the buyer instead.  In other words, the buyer broker has an incentive to ensure that the buyer pays the highest price he will pay with any negotiations to the extent that they take place at all, centered on other possible items like furnishings staying with the house, maintenance, credits, etc.

29. Economic studies have documented and confirmed the prevalence and significance of steering and further "suggest that this could limit price competition."

30. Given that buyer brokers will not show homes to their clients where the seller is offering a lower buyer broker commission, seller brokers face pressure to conform their unilateral blanket offer to the standard commission rates offered in a particular locality.

31.   Further, seller brokers in one transaction are buyer brokers in another, and so are incentivized to enforce a standard commission rate that is insensitive to price competition.

32. In sum, the conspiracy herein complained of has multiple illogical, harmful, irrational, and anticompetitive effects, including that it: (a) requires sellers to pay supra-market rates for services provided by buyer brokers to the buyer, the seller's adversary in the transaction; (b) raises, fixes, and maintains buyer broker compensation at levels that would not exist in a competitive marketplace; (c) encourages and facilitates steering and other agency costs that impede innovation and entry into the market by new and lower-cost real estate brokerage service providers.

33.   Defendants' conspiracy, by inflating buyer broker commissions, has inflated the total commissions paid by home sellers such as Plaintiff and the other Class members, causing the Plaintiff and other class members to incur thousands of dollars in overcharges and damages as a result of the Defendants' conspiracy.

34.   In a properly competitive market, one not affected by Defendants' conspiracy in restraint of that market, the seller would pay nothing to the buyer broker, who would be paid instead by their client, the buyer, and the total commission paid by the

seller would be set at a level to compensate only the seller broker. Even where the seller paid the buyer broker's compensation, that compensation would be subject to consideration offered by the buyer, would be subject to negotiations between the seller and the buyer through their respective agents, and, based on experience from other developed real estate markets, would be substantially lower than the current 2.5 to 3 percent that is currently and typically paid to the buyer brokers.

35. Moreover, in the absence of the Adversary Commission Rule, seller brokers would likely face competitive pressures to set commissions to pay themselves and would engage in vigorous competition to lower rates and/or provide additional services to justify their newly transparent rates.

36. Plaintiffs, on behalf of themselves and the Class, sue for Defendants' violations of federal antitrust laws as alleged herein and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

## THE PARTIES

**Plaintiffs**

37. Plaintiff Shauntell Burton is a resident of the State of South Carolina, County of Spartanburg. She sold a house through a local affiliate of Keller Williams, LLC in Spartanburg, SC in September of 2023. That house was listed through a local MLS, owned by the Spartanburg Association of REALTORS, a local

affiliate of the NAR. Upon information and belief, that MLS
complies with the various mandatory rules set by the NAR. She
paid a buyer's commission of two and one-half per cent and a
total commission of six per cent. The Seller's Settlement
Statement is attached as Exhibit 5.

38. Plaintiff Benny D. Cheatham is a citizen and
resident of the State of South Carolina, County of Spartanburg.
Mr. Cheatham sold a house located on Pawley's Island through the
Litchfield Company Real Estate in July, 2023. That house was
listed on the Coastal Carolinas MLS, owned by the Coastal
Carolinas Association of REALTORS, a local affiliate of the NAR.
Mr. Cheatham paid a total commission of five percent, evenly
split as a buyer and seller commission, all to The Litchfield
Company Real Estate. The Seller's Closing Disclosure is attached
as Exhibit 6.

39. Plaintiffs Douglas Wayne Fender and Dena Marie
Fender are citizens of the State of South Carolina, County of
Lexington. Mr. and Mrs. Fender sold a property in Richland County
that was listed on the Consolidated Multiple Listing Service, a
private Multiple Listing Service discussed below. Plaintiffs Mr.
and Mrs. Fender paid a total commission of five percent, evenly
split between the buyer's agent Century 21 Vanguard and the
seller's agent Coldwell Banker Realty.  The sale took place in
August, 2023. A copy of their settlement statement is attached as

Exhibit 7.

40.   The Plaintiff Robert Douglass is a citizen of the State of South Carolina, County of Charleston.  Plaintiff Douglass sold a property in Charleston County that was listed on the CHS Regional MLS in February, 2023.  He paid a six percent total commission split evenly between the buyer's agent Maven Realty and the seller's agent Daniel Ravenel Sotheby's International Realty.  A copy of his settlement statement is attached as Exhibit 8.

**Defendants**

41.   The Defendant, Bluefield Realty Group, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business in the State of South Carolina. Defendant has 124 Real Estate Agents on staff, all of whom are members of National Association of Realtors.

42.   The Defendant, Allen Tate Real Estate, LLC, is a limited liability company formed under the laws of the State of North Carolina, but doing business within the State of South Carolina, and doing business in the State of South Carolina. Allen Tate Real Estate, LLC is a regional real estate brokerage firm with offices throughout the southeast. Defendant has 12 offices throughout the Upstate of South Carolina with 244 Real Estate Agents.

43.   The Defendant, McClendon Realty, LLC, is a limited

liability company formed under the laws of the State of South
Carolina, and doing business in the State of South Carolina.
Defendant has 17 agents and its principal presently sits on the
Greenwood Association of Realtors Board of Directors.

44. The Defendant, Grand Strand Homes and Land Realty,
LLC, is a limited liability company formed under the laws of the
State of South Carolina, and doing business in the State of South
Carolina. Defendant has 36 agents, all of whom are active within
the Coastal Carolina Association of Realtors territory.

45. The Defendant, S.H. June & Associates, LLC, is a
limited liability company formed under of the laws of the State
of South Carolina, and doing business in the State of South
Carolina. Defendant has 18 agents, all of whom are Realtors.

46. The Defendant, Duncan Group Properties, LLC, is a
limited liability company formed under the laws of the State of
South Carolina, and doing business in the State of South
Carolina. Defendant has 22 agents, all of whom are members of the
National Association of Realtors.

47. The Defendant, Matt O'Neill Real Estate, LLC, is a
limited liability company formed under the laws of the State of
South Carolina, and doing business in the State of South
Carolina. Defendant with 65 agents, almost all of whom are
members of the National Association of Realtors. Defendant
further has a number of other members of staff who are also

members of the National Association of Realtors.

48. The Defendant, The Cassina Group, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business in the State of South Carolina. Defendant has 47 sales people, all of whom are members of The National Association of Realtors.

49. The Defendant, William Means Real Estate, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business in the State of South Carolina. Defendant has 41 agents on staff.

50. The Defendants, Carolina One Edisto, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business in the State of South Carolina. Defendant claims to participate in 1/3 of all sales through The Greater Charleston MLS. It has 14 offices with more than 1,000 sales associates.

51. The Defendant, Carriage Properties, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business in the State of South Carolina. Defendant has 27 agents on staff.

52. The Defendant, LPT, LLC, is a limited liability company, formed under the laws of Delaware, but doing business in the State of South Carolina. Included in LPT, LLC, is Jeff Cook Real Estate, a formerly independent broker primarily doing

business in the Charleston area of South Carolina as Jeff Cook
Enterprises, LLC, a limited liability company in good standing
formed under the laws of the State of South Carolina. Jeff Cook
Real Estate alone has 148 agents on staff.

53.  The Defendant, Silver Star Real Estate, LLC, is a
limited liability company formed under the laws of the State of
South Carolina, and doing business in the State of South
Carolina. Defendant has 10 Residential Specialist and closed more
than 10,000,000 dollars in sales volume in 2019 alone.

54. The Defendants, Clardy Real Estate, Inc., is a
corporation organized and existing under the laws of the State of
South Carolina, and doing business in the State of South
Carolina. Defendant has 33 agents on staff, all of whom are
members of the National Association of Realtors.

55.  The Defendant, Axcent Real Estate, LLC, is a
limited liability company formed under the laws of the State of
South Carolina, and doing business within the State of South
Carolina. Defendant has 16 members of the National Association of
Realtors on staff.

56.  The Defendant, Great Homes of South Carolina, LLC,
is a is a limited liability company formed under the laws of the
State of South Carolina, and doing business within the State of
South Carolina. Defendant has 24 members of the National
Association of Realtors on staff.

57.   The Defendant, Carolina Real Estate Company, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business within the State of South Carolina. Defendant has 18 sales associates on staff.

58.   The Defendant, Meybohm Realty, Inc., is a foreign corporation incorporated under the laws of the State of Georgia, but doing business in the State of South Carolina. Defendant has at least 145 agents in South Carolina, primarily in the Aiken and North Augusta area.

59.   The Defendant, Carolina Realty of the Low Country, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business within the State of South Carolina. Defendant has 20 agents on staff.

60.   The Defendant, Ballenger Realty, LLC, is a limited liability company formed under the laws of the State of South Carolina, and doing business within the State of South Carolina. Defendant has 14 agents all of whom are members of the National Association of Realtors.

61.   The Defendant, Low Country Real Estate of Beaufort, Inc., is a corporation organized and existing under the laws of the State of South Carolina, and doing business in the State of South Carolina. Defendant has 21 agents on staff.

62.   The Defendant, Advantage Realty Group, Inc., is a corporation organized and existing under the laws of the State of

South Carolina, and doing business in the State of South
Carolina. Defendant has 35 agents on staff.

63.  The Defendant, Lake Homes Realty, LLC, is a
foreign corporation formed under the laws of the State of
Delaware, but doing significant business within the State of
South Carolina. It holds a Certificate of Authority to transact
business that was last amended on March 23, 2023. It has 14
agents throughout the State of South Carolina.

64.  The Defendant, Jackson Stanley Realtors LLC, is a
limited liability company formed under the laws of the State of
South Carolina, and doing significant business within the State
of South Carolina. Defendant has at least 22 agents, many of whom
are members of the National Association of Realtors.

65.  The Defendant, BlackStream International Real
Estate, LLC, is a limited liability company formed under the laws
of the State of South Carolina, and doing substantial business
within the State of South Carolina. Defendant has at least 78
agents in the State of South Carolina, most of whom are members
of the National Association of Realtors.

66.  The Defendant, Charter One Realty & Marketing
Beaufort, LLC, is a limited liability company formed under the
laws of the State of South Carolina, and doing business within
the State of South Carolina. The Defendant, Charter One Realty &
Marketing Gateway, LLC, is a limited liability company formed

under the laws of the State of South Carolina, and doing business
in the State of South Carolina. The Defendant, Charter One Realty
& Marketing North, LLC, is a limited liability company formed
under the laws of the State of South Carolina, and doing business
in the State of South Carolina. These entities form a corporate
group that will be referred to as "Charter One Realty" within
this Complaint. Defendant has at least 156 agents on staff many
of whom are members of the National Association of Realtors.

67.    The Defendant, The Ponce Realty Group, LLC, is a
limited liability company formed under the laws of the State of
South Carolina, and doing substantial business within the State
of South Carolina. Defendant has 148 agents in the Upstate of
South Carolina.

68.    The Defendant, Encore Realty LLC, is a limited
liability company, formed under the laws of the State of South
Carolina, and doing business within the State of South Carolina.
Defendant has at least 12 agents all of whom are member of the
National Association of Realtors.

69.    The Defendant, Marchant Real Estate, Inc., is a
corporation organized and existing under the laws of the State of
South Carolina, and doing business within the State of South
Carolina. Defendant has 30 agents in Greenville South Carolina,
many of whom are members of the Columbia Association of Realtors

70.    The Defendant, The Art of Real Estate, LLC, is a

limited liability company formed under the laws of the State of
South Carolina, and doing business within the State of South
Carolina. Defendant with 17 agents in South Carolina, all of whom
are members of the National Association of Realtors.

71.   The Defendant, Wolfe & Taylor, Inc., is a
corporation organized and existing under the laws of the State of
South Carolina, and doing business within the State of South
Carolina. Defendant has 12 agents all of whom are members of the
National Association of Realtors.

72.   The Defendant, eXp Realty Holdings, Inc., is a
corporation organized and existing under the laws of the State of
Delaware.

73.   The Defendant, Home Services of America, Inc., is
a corporation organized and existing under the laws of the State
of Delaware and headquartered in Minnesota.  Home Services of
America is the majority owner of the Defendant, HSF Affiliates,
LLC.  HSF Affiliates has operated in a number of real estate
franchise networks, including Berkshire Hathaway, Home Services,
and Real Living.  They further own the Long and Foster Companies,
Inc.  This group will be referred to as "Home Services."

74.   The Defendant, Weichert Realtors, is a national
brokerage company with its principal place of business in New
Jersey.  However, it operates substantial number of real estate
brokerages within the State of South Carolina, to include 16

offices in South Carolina with more than 300 agents.

75.    The Defendant, Hanna Holdings, Inc. (Howard Hanna) is a privately held real estate brokerage company incorporated in Delaware with its principal place of business in Pennsylvania. However, it operates eleven (11) brokerages, primarily in the Upstate of South Carolina and has an office at Rock Hill, South Carolina; Lancaster, South Carolina; four (4) offices in the Greenville area; one (1) office in Anderson, South Carolina; and three (3) offices near Lake Keowee, South Carolina.

76.    The Defendant, Realty ONE Group, Inc., is a real estate brokerage and franchising company headquartered in California and incorporated in Nevada.  The firm is one of the largest real estate franchisors.  It has thirteen (13) brokerages in the State of South Carolina, with some 820 agents, many of whom are members of the National Association of Realtors.

77.    The Defendant, @World Properties, LLC d/b/a @ Properties Christie's International Real Estate, Inc., is a corporation organized and existing under the laws of the State of Illinois with its headquarters in Chicago, Illinois.  It has eighteen (18) brokerage offices in the State of South Carolina spread throughout the State of South Carolina.

78.    The Defendant, The Litchfield Company Real Estate, is a business affiliated with Christie's International Real Estate, Inc., however, it appears to be a separate legal entity.

It does substantially all of its business within the state of South Carolina. It does not appear to be incorporated, though a reservation for the name "The Litchfield Company Real Estate, LLC." was made in 2017 that expired in 2018.

79.  The Defendant, Graham Realty, Inc., is a corporation organized and existing under the laws of the State of South Carolina.  It operates primarily in Kershaw County and has ten agents on staff, all of whom are REALTORS. In addition, it has other members of its staff who are REALTORS.

80.  The Defendant, Del-Co Realty Group, Inc., is a corporation organized and existing under the laws of the State of South Carolina.  It has at least 16 REALTORS on staff.

81.  The Defendant, The Boulevard Realty Company, Inc., is a corporation organized and existing under the laws of the State of South Carolina.  It has roughly 310 agents, all of whom are active in the Charleston area.

82.  The Defendant, HomesFinder Realty Group, LLC., is a corporation organized and existing under the laws of the State of South Carolina.

83.  The Defendant, REsides, Inc., is a corporation organized and existing under the laws of the state of Delaware. It does all or substantially all of its business in the State of South Carolina.  It is further headquartered on Hilton Head Island, South Carolina.

84. The Defendant, Home & Land Pro's LLC, is a corporation organized and existing under the laws of the State of South Carolina.  It does all or substantially all of its business in the State of South Carolina.

85. The Defendants, C. Dan Joyner Co., Inc. and C. Dan Joyner Enterprises, Inc., are corporations organized and existing under the laws of the State of South Carolina.  They serve as an independently owned and operated franchise of Defendant Home Services of America, Inc.

86. The Defendant, Cambridge Realty, is a corporation organized and existing under the laws of the State of South Carolina. It serves as an independently owned and operated franchise of Defendant Home Services of America, Inc.

87. The Defendant, Weichert Beaufort LLC, is a corporation organized and existing under the laws of the State of South Carolina.  It does business in South Carolina under the name of Weichert-Coastal Properties and operates as an independently owned and operated franchise of Defendant Weichert Realty.

88.  The Defendant, Fathom Realty Holdings, LLC, is a Texas corporation doing substantial business in at least twenty-three (23) states, including South Carolina.

89.  Each of the Defendants has a significant presence in the markets contained within the District of South Carolina,

membership within the MLSs that comprise the real estate market of the District of South Carolina and transact substantial business in the District of South Carolina.

**Co-Conspirators and Agents**

90.    In addition to the named Defendants, there are many other brokerages that have extensive business operations, to include brokerage subsidiaries, franchisees, and/or affiliates, which collectively are involved in a substantial number of residential real estate listings in the various MLSs that comprise the District of South Carolina's real estate market and a substantial number of the sales of homes listed in the District of South Carolina through those various MLSs. These brokerages are included within the term Agency conspirators.

91.    These brokerages have received millions of dollars in revenue attributable to business transacted in the District of South Carolina from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in South Carolina.

92.    These brokerages are equal participants in the conspiracy complained of herein and take similar steps as the named Defendants.

93.    These brokerages and their agents and staff are also members of the NAR, as well at its state and/or local affiliates and participate in and implement the conspiracy by

serving on boards and committees that enforce compliance with NAR rules through both "carrots and sticks."

94.   There are many other local REALTOR associations and real estate brokers participating as co-conspirators in the violations alleged herein and performing acts and making statements in furtherance thereof.  Specifically, all who own, operate, and participate in MLSs within the District agree to, comply with, and implement the Adversary Commission Rule.

95.   By adopting the Adversary Commission Rule, the MLSs that make up the real estate market of the District of South Carolina and their members have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and made statements in furtherance thereof.

96.   Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

### JURISDICTION AND VENUE

97.   This court has subject matter jurisdiction under 28 U.S.C. §§1331, 1337 and 15 U.S.C. §4 because the suit raises a federal question and "airs[es] under [an] Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

98.   This Court has personal jurisdiction over Defendants, each of which will be properly served. Defendants

have: (1) transacted substantial business throughout the United States and the District of South Carolina, (2) transacted business with members of the Class within the United States and the District of South Carolina, (3) had substantial contacts with the United States and the District of South Carolina, and (4) committed substantial acts in furtherance of their unlawful scheme in the United States and the District of South Carolina.

99.  Each Defendant transacts substantial business within the District of South Carolina.

100. The Agency Defendants each have extensive business operations, many of which include brokerage subsidiaries, franchisees, and/or affiliates, which collectively are involved in a substantial number of residential real estate listings in the various MLSs that comprise the District of South Carolina's real estate market and a substantial number of the sales of homes listed in the District of South Carolina through those various MLSs.

101. The Agency Defendants received millions of dollars in revenue attributable to business transacted in the District of South Carolina from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in South Carolina.

102. NAR's Interpretations of the Code of Ethics reflects that NAR, through its Professional Standards Committee,

interacts and conducts business with arbitration Hearing Panels and Boards of Directors of local real estate associations (including the local associations operating in areas covered by MLSs and those that actively operate those MLSs) to review and articulate policies and principles that are applied in specific disputes involving REALTORS. These Interpretations are often mandatory and govern arbitral rulings within the District of South Carolina in disputes between REALTORS.

103. NAR requires Agency Defendants and their local franchisees, as well as other co-conspirators operating in the District of South Carolina, to comply with NAR policies, including its Handbook on Multiple Listing Policy and Code of Ethics in order to use the MLS system.

104. Among the policies that NAR requires the Agency Defendants and its co-conspirators to follow in this District is the Adversary Commission Rule.

105. Upon information and belief, NAR actively monitors and polices the Agency Defendants and other co-conspirators operating in the District to ensure full compliance with its Rules and Policies, including the Adversary Commission Rule. Failure to comply with these policies, to include the Adversary Commission Rule, will result in the removal of the entity or individual from the NAR membership and, in turn, expulsion from the MLSs that comprise the real estate market of the District of

South Carolina.

106. NAR and its state and local affiliates engage in substantial lobbying aimed at various governmental entities and political candidates at every level of government. In the period beginning January 1, 2023 and ending May 1, 2023, for example, the South Carolina Association of REALTORS, the state level affiliate of the National Association of REALTORS, paid lobbyists $75,000 and made another $178,359.70 in expenditures in the District of South Carolina.

107. Venue is proper in this District under 15 U.S.C. §22 and under 28 U.S.C. §1391(b),(c), and (d). Each Defendant transacted business, was and is found, had agents and/or resided in this District; a substantial portion of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

108. The Adversary Commission Rule and other anticompetitive NAR rules apply and have been implemented by the co-conspirators in interstate commerce, including in this District. These rules govern the conduct of local NAR associations, local brokers, and local sales agents across multiple states, including but not limited to South Carolina and its MLSs.

109. Defendants' conduct alleged herein has inflated

buyer broker commissions nationwide, including in this District,
and has injured home sellers in this District and nationwide.
Defendant NAR, through its members and co-conspirators, in
particular the Agency Defendants, where appropriate through its
franchisees, subsidiaries, and/or affiliates, are engaged in
interstate commerce, and are engaged in activities affecting
interstate commerce within the United States.

**FACTUAL ALLEGATIONS**

**Real Estate Background**

110. South Carolina state licensing laws regulate who
can represent sellers and buyers in the real estate market.
There is a real estate broker-in-charge of each brokerage.  This
broker-in-charge is responsible for the supervision of the
brokerage's brokers and salespersons. Those brokers and
salespeople are defined as "associated licensees."  If and when
those brokers or salespeople leave a particular broker-in-charge,
they are required to notify the real estate commission
immediately.  These brokers-in-charge are legally responsible for
the associated licensees.

111. Brokers-in-charge and their associated licensees
occupy dual roles in that they act as selling brokers for some
home sales and act as buyer brokers in other home sales.

112. According to NAR, 92% of sellers sold their home
with the assistance of a real estate broker in 2017 and 87% of

buyers purchased their home with the assistance of a real estate broker that same year.

113. In typical residential real estate transactions, brokers-in-charge and associated licensees receive compensation through commissions that are calculated as a percentage of a home's sale price and the commissions are paid when the home sells.

114. A seller broker's compensation is set forth in a listing agreement made between the seller and the seller broker. This agreement includes terms of the listing and often provides that the seller broker has exclusive rights to market the seller's home.  Due to the Adversary Commission Rule, the listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount to be paid to the buyer broker in the likely event that there is one.

115. When a buyer retains a broker, the buyer enters into a contract with that broker for the broker to act as his agent.  The contract generally discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

116. If the buyer has a broker, as almost all of them do, the seller broker pays the buyer broker a commission out of the total commission paid by the seller.

**National Association of REALTORS**

117.   The National Association of REALTORS was founded as the National Board of Real Estate Exchanges in 1908 in Chicago, Illinois.  It trademarked the word REALTOR in 1949 and changed its name to the National Association of REALTORS in 1972.

118.   The NAR's Code of Ethics was first promulgated in 1913.

119.   This Code of Ethics "protects consumers" by mandating that "REALTORS cooperate with each other in furthering clients' best interests."[1] This Code of Ethics is attached as Exhibit 2.  The Constitution and Bylaws of the NAR requires that this Code of Ethics be adopted and enforced by the Member Boards. Exhibit 3 at p. 28.

120.   This goal of "cooperation" amongst horizontal competitors has manifested itself in a number of different ways over the years.

121.   The Code of Ethics in 1950, when the NAR was known as the National Association of Real Estate Boards, required that fee schedules promulgated by local boards "should be observed."[2]

122.   As time went on, the NAR continued to try to actualize an even split of commissions between buyer agent and

---

[1] https://www.nar.realtor/about-nar/governing-documents/the-code-of-ethics.

[2] *U.S. v. National Ass'n of Real Estate Bds.*, 339 U.S. 485, 495 (1950).

selling agent and to ensure that the seller paid both agents.

123. Prior to 1996, for example, NAR, its affiliates, and other conspirators designed, implemented, and enforced a policy that created a bizarre market structure that made the buyer broker into a sub-agent of the seller where the buyer broker was not the seller's broker.

124. This market structure also ultimately required the seller to compensate both the buyer broker and the seller broker.

125. This arrangement collapsed under the weight of press coverage rather rapidly.

**Multiple Listing Services**

126. Multiple Listing Services (MLS) are essentially a database of properties listed for sale, generally in a particular geographical area.

127. The NAR has defined an MLS as "a means by which authorized participants make blanket unilateral offers of compensation to other participants." Ex. 1 at p. 3.

128. MLSs solve informational disparities between brokers by allowing all brokers, or substantially all brokers, to see the inventory of properties offered for sale in that particular area.

129. As they evolved, however, the NAR's local associations became increasingly involved in the promotion of MLSs and the promulgation of rules by which those MLSs would be

run.

130.  This involvement led the local associations of the NAR to become the gatekeeper for the information held in the MLSs.

131.  This gatekeeping role for the most important information a Real Estate Agent could possess, available houses for sale, led more and more Real Estate Agents to join the NAR, which has resulted in the NAR becoming the largest trade association in the United States.

132.  Because most active Real Estate Agents are REALTORS, the NAR carries outsized power in the Multiple Listing Service organizations, whether formally affiliated with the NAR or not.

133.  Indeed, most MLSs are run in close association with, and under rules promulgated by, the National Association of REALTORS.

134.  Even those MLSs that are not run by or affiliated with the National Association of REALTORS generally mirror the rules promulgated by the NAR.  Many of these MLSs spring from local NAR boards and are run by or owned by REALTORS.

**Development of The Anticompetitive NAR Rules**

135. The Adversary Commission Rule was adopted by NAR in 1996 in its Handbook on Multiple Listing Policy ("Handbook") and has been in effect ever since.

136. To replace the market structure discussed in paragraph 123, but retain the compensation structure, the NAR and its co-conspirators implemented and enforced the present anticompetitive and deceptive scheme to ensure the continued existence of supra-market rate commissions and impede innovation and lower-priced competition.

137. The lynchpin of this scheme is the Adversary Commission Rule, which requires that the seller make blanket, unilateral offers of compensation to buyer brokers when listing a home on an MLS.

138. The NAR Board of Directors, and committees reporting to it, determine from time to time whether to modify any policies in the Handbook, and the Board has approved certain changes in recent years within the MLSs that make up the real estate market of the District of South Carolina.

139. All policies, whether retained, modified, or new, are then incorporated in the new editions of the Handbook.  That Handbook is almost always issued annually.

140. The Board of Directors of NAR has consistently and repeatedly agreed and chosen to retain the Adversary Commission Rule in the Handbook even in the face of criticism by economists and industry experts that the Adversary Commission Rule is anticompetitive and causes supra-market commission rates.

141. In revising and re-issuing the Handbook, NAR has

invited each of the other conspirators to participate in the agreement, combination, and conspiracy defined herein.

142. Each conspirator may participate in the various MLSs that make up the real estate markets of the United States, particularly in this case those comprising the real estate market of the District of South Carolina, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook.

143. Each conspirator, to include the Agency Defendants, has, without fail, participated in those various MLSs.

144. Each MLS promulgates its own penalties for breaching the rules published by the NAR within the handbook. Each Agency Defendant has participated in the development, promulgation, and enforcement of those MLS specific rules.

145. As such, the conspirators, to the extent that they claim not to have authored the Handbook itself, the Adversary Commission Rule, or the other anticompetitive rules contained therein, have still agreed to abide by, implement, and enforce those policies, to include the Adversary Commission Rule.

**The Anticompetitive Rules At Issue**

146. In defining what an MLS is, NAR defines it as "a means by which authorized participants make blanket unilateral offers of compensation to other participants." Ex. 1 at p. 3.

This statement admits that the Adversary Commission Rule is fundamental to the MLS system.

147. The Handbook goes on to state on page 39 the Adversary Commission Rule this way:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants.

148. The Handbook also requires on page 40

> The multiple listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker.

149. The Handbook also states on page 40 that

> Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships.

150. NAR's Code of Ethics, Exhibit 2, Standard Practice 16-16, states:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers,

shall not use the terms of an offer to
purchase/lease to attempt to modify the
listing broker's offer of compensation to
subagents or buyer/tenant representatives or
brokers nor make the submission of an
executed offer to purchase/lease contingent
on the listing broker's agreement to modify
the offer of compensation.

151. The effect of these rules is not simply that the
seller must pay the buyer broker's compensation.  These rules
effectively take the compensation structure out of the view of
the buyers and sellers, masking who pays the buyer broker's
compensation.

152. These rules further ban the negotiation of the
buyer broker's total compensation by either their principal, the
buyer, or the party paying the compensation, the seller.  Indeed,
a buyer broker may not even present an offer to a seller that is
conditional on the seller reducing the buyer broker commission.

153. The Adversary Commission Rule shifts a cost to the
seller that would otherwise be paid by the buyer in a competitive
market.  This rule, when coupled with Standard Practice 16-16, is
simply not economically rational.

154. The Adversary Commission Rule creates a chain
reaction of obligations of which a home seller is, at best, only
dimly aware.  That home seller, in hiring a seller broker to
market her home to the public, is not simply hiring a seller
broker, the service she wants.

155.  If that seller broker is a member of the MLS system, as he must be for his business to be economically viable or in order to take advantage of the conspiracy of which he is a part, that seller broker must publish the home on the MLS serving that geographical region, unless the Seller has specifically refused permission to post it.

156.  If the Seller refuses permission to post the property on the MLS, she will have constricted her set of buyers to an almost minuscule portion of the possible universe of buyers.

157.  Further, because the seller broker is almost always obligated to publish that home on the MLS, the seller is obligated to provide a unilateral offer of compensation to an as yet unidentified buyer broker, thus tying the seller's purchase of a seller broker to the purchase of the services of an as yet unidentified buyer broker member of the MLS serving that geographical region.

158. This is a tying transaction because both the seller broker and the buyer broker are affiliated through NAR, the association through which MLS rules are promulgated and enforced.

159. The seller has an economic interest in the tying mechanism because the now-seller broker will be a buyer broker in a different transaction within the MLS.

160. Further, members of the MLSs that comprise the real estate market of the District of South Carolina are almost always REALTORS.  While it is not required that a REALTOR be a member of an MLS, Ex. 1 at 30, it is generally required that, to be a member of an MLS, one ought to be required to be a member of the local associations, Id.  As such, the NAR, as a trade association, is promoting its members' economic interest by promoting, requiring, and enforcing the anticompetitive tie.

161. The blanket, unilateral offer of compensation provides incentive for a seller broker to set his compensation level at the standard compensation rate because he will often be a buyer broker in other transactions.  The system thus fostered essentially leads to one in which the brokers, regardless of which side of the transaction they are on, agree to split an artificially high commission rather than compete on the basis of factors the market deems valuable, like level of service, price, experience, actual work performed, etc.

162. NAR has further published case interpretations which ensure and exacerbate the anticompetitive effects of both its ethical rules and its Handbook policies.

163. But for the Adversary Commission Rule and other anticompetitive rules and policies of NAR, buyers (not sellers) would pay the commission to their broker. Brokers would have to engage in competition by offering lower commissions to

prospective buyers.

164. Selling brokers would face downward pressure on total commissions and renewed competition to earn business from home sellers, as seller brokers would no longer be calculating their commission rates to include any compensation for the buyer broker.

165. Home sellers would no longer be required to purchase the services of an as yet unidentified buyer broker as a prerequisite to entering the market.

**Enforcement of NAR's Anticompetitive Rules**

166. The NAR's rules create a framework and an invitation to the conspiracy. However, they require that state and local Real Estate Agents agree to operate within and enforce this framework in a consistent fashion throughout a particular state.

167. If those rules are patchily enforced throughout a state, it would be easy for consumers to break the anticompetitive practices because they would become particularly obvious. Between states, differences in practice can be ascribed to different state laws.

168. As such, while the Agency Defendants listed above may not have national market power, the fact that they do have market power within South Carolina and its smaller MLS markets, which allows them to administer the anticompetitive rules,

renders them at least as culpable as those national companies responsible for the promulgation of those anticompetitive rules.

169.  Each MLS has a list of fines by which they punish deviations from the anticompetitive rules complained of herein.

170.  Each Local board has taken part in ensuring its members follow the ethics rules discussed above and that the MLS boards properly administer the anticompetitive rules discussed herein.

171.  The South Carolina Board of REALTORS has similarly ensured its constituent boards and MLSs adopt and follow the Handbook described above, enforce the anticompetitive rules discussed above, and otherwise ensured that buyer brokers are compensated by the seller at a rate of roughly 3 percent.

172.  Each of the Agency Defendants, as discussed below, have been active at either the State or local level in South Carolina and thus have participated in adopting, promulgating, and, most importantly, enforcing the anticompetitive rules herein complained of.

**South Carolina's REALTOR Landscape**

173.  The NAR has been extremely successful, particularly in South Carolina.

174.  There are more than 18,000 REALTORS in the

State,[3] out of roughly 24,000 total agents.

175.   There are 15 local boards. Another local board is listed on the South Carolina REALTORS website, but excluded from this suit because it involves Commercial Real Estate.

176.   Those boards are the Aiken Association of REALTORS, Beaufort-Jasper County REALTORS, Central Carolina REALTORS Association, Charleston Trident Association of REALTORS, Cherokee County Board of REALTORS, Coastal Carolinas Association of REALTORS, Greater Greenville Association of REALTORS, Greenwood Association of REALTORS, Hilton Head Area Realtors, Kershaw County Board of REALTORS, Pee Dee Realtor Association, Piedmont Regional Association of REALTORS, Spartanburg Association of REALTORS, Sumter Board of REALTORS, and Western Upstate Association of REALTORS.

177.   The MLS associated with the Aiken Association of REALTORS is the Aiken MLS.

178.   The MLS associated with the Beaufort-Jasper County REALTORS is the Lowcountry Regional MLS.

179.   The MLS associated with the Central Carolina REALTORS Association is the Palmetto MLS.

180.   The MLS associated with the Charleston Trident Association of REALTORS is the CHS Regional MLS.

---

[3] https://www.screaltors.org/connect/

181.  The MLS associated with the Cherokee County Board of REALTORS is the Cherokee County MLS.

182.  The MLS associated with the Coastal Carolinas Association of REALTORS is the Coastal Carolinas MLS.

183.  The MLS associated with the Greater Greenville Association of REALTORS is the Greenville MLS.

184.  The MLS associated with the Greenwood Association of REALTORS is the MLS of Greenwood, SC.

185.  The MLS associated with the Hilton Head Area REALTORS was formerly the Hilton Head Area MLS, but it has since transitioned into the privately owned Resides.io, a non-NAR affiliated MLS defendant.

186.  The MLS associated with the Kershaw County Board of REALTORS is the Kershaw County MLS.

187.  The MLS associated with the Pee Dee REALTOR Association is the Greater Pee Dee Multiple Listing Service, Inc.

188.  The MLS associated with the Piedmont Regional Association of REALTORS is the Canopy MLS of Charlotte, formerly the Piedmont Regional MLS.

189.  The MLS associated with the Spartanburg Association of REALTORS is the Multiple Listing Service of Spartanburg, Inc.

190.  The MLS associated with the Sumter Board of REALTORS is the Sumter Board of REALTORS MLS.

191.   The MLS associated with the Western Upstate Association of REALTORS is the Western Upstate Association of REALTORS MLS.

192.   A majority of the Agents at each Agency Defendant is a member of the National Association of REALTORS and the State and Local Board in the location in which they work.

193.   Each of the Agency Defendants have both made and accepted unilateral offers of compensation on each of the MLSs representing the geographical area in which they represent buyers and sellers of houses.

194.   As discussed below, many of the Agency Defendants has further had principals or members who were members of the boards either of the MLSs of which they were members, the local boards of directors of the REALTOR associations of which they were members, and/or members of the Board of Directors for the South Carolina State Board of REALTORS, meaning that each of those Agency Defendants has taken part in the promulgation and enforcement of the various anticompetitive rules complained of herein.

**The South Carolina Board of REALTORS**

195.   Defendants Carolina One, Wolfe & Taylor, Home Services, Ponce Realty, Carolina Realty of the Low Country, Weichert, Allen Tate Realtors, The Cassina Group, Meybohm Real Estate, Del-Co Realty Group, Jackson Stanley, C. Dan Joyner,

Weichert Beaufort LLC., and BlackStream International all had at least one member serve in the leadership committee of the South Carolina Association of REALTORS.

196.   As discussed above, the South Carolina Association of REALTORS is an integral part of the enforcement of the conspiracy.  It ensures that the Handbook and the Code of Ethics is followed throughout the State of South Carolina.

197.   It further has the ability to discipline and expel REALTORS, local boards of REALTORS, and MLSs that do not follow the National Association's rules.

198.   The South Carolina Board of REALTORS is the conduit by which information, rules, and the Code of Ethics is transmitted from the promulgating bodies within the National Association of REALTORS and the local boards of REALTORS and MLSs.

199.   It also serves to communicate information, particularly objections, up to the National Association.  There is no evidence that the South Carolina Board of REALTORS attempted to avoid the application of the anticompetitive rules complained of herein.

200.   Indeed, the available evidence is that, even where an MLS was not associated with the South Carolina Board of REALTORS, members ensured that those MLSs followed the rules promulgated by the National Association.

201.  The Agency Defendants, to include the Defendants named in paragraph 195 above, wholeheartedly embraced the conspiracy as envisioned by the National Association and ensured that the State Board's power, both persuasive and coercive, was used to effectuate the conspiracy.

202.  By joining the leadership of the South Carolina Association of REALTORS, these Defendants demonstrated more willingness than most other REALTORS to ensure that the conspiracy continued.

**The Aiken Board of REALTORS and Its MLS**

203.  Defendant Carolina Real Estate Company and Meybohm Real Estate all have been members of the Board of Directors for the Aiken Board of REALTORS.

204.  The Aiken MLS is, upon information and belief, a wholly owned subsidiary of the Aiken Board of REALTORS.  In any event, the Aiken Board of REALTORS exercised dominion and control over the Aiken MLS.

205.  The policies and procedures of the Aiken MLS are substantially the same as those required by the National Association of REALTORS.

206.  Policy number 6 under the heading Listings requires that Listings must be presented on the Aiken Multiple Listing Service within 2 business days of the signatures of the seller or within 1 business day of advertising the property to

the general public.  Exhibit 9 on p. 5.

207.  Policy 6(b) requires that "a broker must submit the listing to the MLS for cooperation with other MLS participants."  This is the way by which the Adverse Commission Rule has been put into effect.

208.  Policy number 19 under the heading Listings further allows an MLS subscriber to co list with a Non-REALTOR, but that the listing may not be listed on the MLS.  This demonstrates that the MLS is not open to non-REALTORS.

209.  The MLS Rules and Regulations for the Aiken Association of REALTORS, under the Heading Participation, state that, for a Participant, "the key is that the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation with respect to the properties of the type that are listed on the MLS."  Exhibit 10 at p. 1.

210.  Indeed, the MLS Rules as promulgated for the Aiken Association of REALTORS requires that listings "include the authority to cooperate and compensate other brokers."  Exhibit 10 at p. 2.

211.  The MLS Rules, again as adopted, accepted, and acquiesced to by the Defendants Defendant Carolina Real Estate Company and Meybohm Real Estate on behalf of the Aiken Association of REALTORS are the very ones complained of above.

212.  To the extent the Rules and Policies do not

otherwise set a punishment, the Policies set out a common fine schedule.

213.   This fine schedule is adopted by the Board of Directors, enforced by MLS staff, but appeals are heard by REALTORS. Indeed, other violations are deal with in accordance with Section 9.1 of the Rules.  Exhibit 10 at p. 14.

214.   Again, the Aiken Board of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 203 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

215.   These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Beaufort-Jasper Board of REALTORS and Its MLS**

216.   Defendants Homesfinder Realty Group, LLC, HomeServices, and Low Country Real Estate of Beaufort have both had at least one individual serve as Officers of the Beaufort-Jasper Board of REALTORS.

217.   Defendants Ballenger Realty, Homesfinder Realty Group, and Carolina Realty of the Low Country all had at least one member denominated as Directors by the Beaufort-Jasper Board

of REALTORS.

218.   The Lowcountry Regional Multiple Listing Service is, upon information and belief, a wholly owned subsidiary of the Beaufort-Jasper Board of REALTORS.  In any event, the Beaufort-Jasper Board of REALTORS exercised dominion and control over the Lowcountry Regional Multiple Listing Service.

219.   Upon information and belief the Rules, Regulations and Bylaws of the Lowcountry MLS mirror those discussed above with respect to Aiken.  The discipline schedule for the Lowcountry Regional MLS is imposed by the Board of Directors and the REALTOR membership of the Beaufort-Jasper Board of REALTORS.

220. Again, the REALTOR membership of the Board of REALTORS imposes discipline on those REALTORS who fail to follow the anticompetitive rules complained of above.

221.   Again, the Beaufort-Jasper Board of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraphs 216 and 217 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

222.   These Defendants further benefited from the conspiracy by receiving supra market commissions as the

conspiracy intended.

**The Charleston Trident Board of REALTORS and Its MLS**

223.   The Defendants Matt O'Neil Real Estate, LLC., The
Cassina Group, LLC, The Boulevard Realty Company, Inc., William
Means Real Estate, LLC., and Carolina One Edisto have all had one
or more individuals serve on either the CHS Regional MLS or the
Charleston Trident Association of REALTORS Board of Directors or
as an Officer thereto.

224.   The CHS MLS is wholly owned and operated by the
Charleston Trident Association of REALTORS.

225.   The MLS rules and regulations for the CHS MLS
are roughly similar to those discussed above in paragraphs 205 –
213 and the model rules and regulations as published in the
Handbook.  However, the fine structure is set forth within the
CHS MLS's Rules and Regulations in section 9.3.  Exhibit 11 at
20.

226.   Again, these Rules and Regulations are and were
adopted, added to, and enforced by the Defendants on behalf of
the Charleston Trident Board of REALTORS.

227.   These Rules and Regulations are further enforced
by the REALTOR membership of the Charleston Trident Board of
REALTORS.

228.   The Defendants discussed in paragraph 223, rather
than objecting to the anticompetitive rules as promulgated by the

NAR and rejecting the conspiracy to which the NAR invited them, wholeheartedly embraced the supra market commission rates that these rules assured them.

229.    The CHS MLS bylaws further set out that the purpose of the MLS is to ensure that there are "blanket unilateral offers of compensation to other participants." Exhibit 12 at 1.  Those bylaws further reflect the anticompetitive rules discussed above with respect to the NAR. The fact that those bylaws and the Rules and Regulations were enacted is further proof of the acceptance of and the participation by the REALTOR membership of the Charleston Trident Board of REALTORS.

**The Coastal Carolinas Board Of REALTORS and Its MLS**

230.    Defendants Grand Strand Homes and Land Realty, LLC, S. H. June & Associates, LLC. and Duncan Group Properties all had at least one member as an Officer or Director of the Coastal Carolinas Board of REALTORS.

231.    The Coastal Carolina MLS is wholly owned and operated by the Coastal Carolinas Board of REALTORS or is otherwise controlled by the Coastal Carolinas Board of REALTORS.

232.    The Coastal Carolinas MLS Rules and Regulations are and were adopted by the Defendants listed in paragraph 230 and their co-conspirators and mirror the NAR model Rules and Regulations.

233.  Of particular importance, as discussed previously, is that the local Board of REALTORS is in charge of disciplining MLS participants.  Exhibit 13 at Section 9.1.

234.  The Coastal Carolinas MLS Rules and Regulations apply the model NAR Rules and Regulations set forth in the Handbook to the geographic area encompassed by the Coastal Carolinas MLS.

235.  Again, the Coastal Carolinas Board of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 230 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

236.  These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Greater Greenville Board of REALTORS and Its MLS**

237.  Defendants Ponce Realty Group, Encore Realty, HomeServices, C. Dan Joyner, Allen Tate Realtors, and Marchant Real Estate have each had at least one member serve as an Officer or Director of the Greater Greenville Board of REALTORS or its MLS.

238.  The Greater Greenville MLS is wholly owned and

operated by the Greater Greenville Board of REALTORS or is otherwise controlled by the Greater Greenville Board of REALTORS.

239.  Upon information and belief, the Greater Greenville MLS mirrors the bylaws and rules and regulations previously discussed in the paragraphs above.  They further, upon information and belief, mirror the model NAR Rules and Regulations set forth in the Handbook.

240.  Again, the Greater Greenville Board of REALTORS is tasked with enforcing the rules and regulations of the MLS, to include the Adversary Compensation Rule.

241.  Again, the Defendants discussed in paragraph 237 adopted and enforce those Rules and Regulations, the Code of Ethics, and the other anticompetitive Rules discussed above.

242.  Again, the Greater Greenville Board of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 237 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

243.  These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Greenwood Association of REALTORS and Its MLS**

244.   Defendants HomeServices, Cambridge Realty, eXp Realty, and McClendon Realty have each had at least one member serve as an Officer or Director of the Greenwood Association of REALTORS or its MLS.

245.   The Greenwood MLS is wholly owned and operated by the Greenwood Association of REALTORS or is otherwise controlled by the Greenwood Association of REALTORS.

246.   Upon information and belief, the Greenwood MLS mirrors the bylaws and rules and regulations previously discussed in the paragraphs above.  They further, upon information and belief, mirror the model NAR Rules and Regulations set forth in the Handbook.

247.   Defendants discussed in paragraph 244 and their co-conspirators, rather than objecting or rejecting the anticompetitive restraint on trade that the anticompetitive rules the NAR promulgated, wholeheartedly embraced the price fixing goal that the conspiracy had at its roots.

248.   Again, the Greenwood Association of REALTORS and its Board is tasked with enforcing the rules and regulations of the MLS, to include the Adversary Compensation Rule.

249.   Again, the Defendants discussed in paragraph 244 adopted and enforce those Rules and Regulations, the Code of Ethics, and the other anticompetitive Rules discussed above.

250.   Again, the Greenwood Association of REALTORS or

its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 244 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

251.  These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Hilton Head Area REALTORS**

252.  Defendants Charter One Realty, HomeServices, eXp Realty, Weichert Realty, Weichert Beaufort, and the HomesFinder Realty Group have each had at least one member serve as an Officer or Director of the Hilton Head Area REALTORS.

253.  While there is no MLS associated with the Hilton Head Area REALTORS, the former MLS is still largely owned by the Hilton Head Area REALTOR membership.

254.  The Hilton Head Area REALTOR Board is still obligated to discipline members for Code of Ethics violations that occur.

255.  The Hilton Head Area REALTORS further have caused the private Multiple Listing Service that grew out of its former wholly owned MLS to follow the same or substantially the same rules and regulations set forth by the Handbook.

256.    The privately owned MLS is called REsides.

257.    REsides is owned through securities sold through
Regulation D offerings to brokers who participate in the Hilton
Head area.

258.    REsides advertises itself as a "borderless MLS,"
it lists primarily properties in the Hilton Head and Bluffton
area.

259.    REsides has executed a broker reciprocity
agreement that binds it to much the same Rules and Regulations as
are required by the Handbook.   Exhibit 14.

260.    The REsides Rules and Compliance Guidelines
largely match the format and content of the Handbook, as well.

261.    As a practical matter, the owners and subscribers
of REsides and the membership of Hilton Head Area REALTORS is
very nearly the same group of people, people bound to certain
obligations by their membership in and association with the
National Association of REALTORS.

262.    The price fixing conspiracy to which the NAR has
invited Defendants discussed above and the other co-conspirators
is still able to flourish because the anticompetitive practices
championed by the NAR are still enforced by the Hilton Head Area
REALTORS and Resides.

263.    These Defendants further benefited from the
conspiracy by receiving supra market commissions as the

conspiracy intended.

**The Kershaw County Board of REALTORS and Its MLS**

264.   Defendants eXp Realty, Graham Realty, and Home & Land Pro's have each had at least one member serve as an Officer or Director of the Kershaw County Board of REALTORS or its MLS.

265.   The Kershaw County MLS is wholly owned and operated by the Kershaw County Board of REALTORS or is otherwise controlled by the Kershaw County Board of REALTORS.

266.   Upon information and belief, the Kershaw County MLS mirrors the bylaws and rules and regulations previously discussed in the paragraphs above.  They further, upon information and belief, mirror the model NAR Rules and Regulations set forth in the Handbook.

267.   Defendants discussed in paragraph 264 and their co-conspirators, rather than objecting or rejecting the anticompetitive restraint on trade that the anticompetitive rules the NAR promulgated, wholeheartedly embraced the price fixing goal that the conspiracy had at its roots.

268.   Again, the Kershaw County Board of REALTORS and its Board is tasked with enforcing the rules and regulations of the MLS, to include the Adversary Compensation Rule.

269.   Again, the Defendants discussed in paragraph 264 adopted and enforce those Rules and Regulations, the Code of Ethics, and the other anticompetitive Rules discussed above.

270.   Again, the Kershaw County Board of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 264 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

271.   These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Pee Dee REALTOR Association and Its MLS**

272.   Defendant eXp Realty has had at least one member serve as an Officer or Director of the Pee Dee REALTOR Association or its MLS.  There are a number of other Realty companies that have also had members so serve, but those realty companies are otherwise immune from suit at this time.

273.   The Pee Dee MLS is wholly owned and operated by the Pee Dee Association of REALTORS or is otherwise controlled by the Pee Dee Association of REALTORS.

274.   Upon information and belief, the Pee Dee MLS mirrors the bylaws and rules and regulations previously discussed in the paragraphs above.  They further, upon information and belief, mirror the model NAR Rules and Regulations set forth in the Handbook.

275.   Defendant eXP and its co-conspirators, rather than objecting or rejecting the anticompetitive restraint on trade that the anticompetitive rules the NAR promulgated, wholeheartedly embraced the price fixing goal that the conspiracy had at its roots.

276.   Again, the Pee Dee Association of REALTORS and its Board is tasked with enforcing the rules and regulations of the MLS, to include the Adversary Compensation Rule.

277.   Again, the Defendant discussed in paragraph 272 adopted and enforces those Rules and Regulations, the Code of Ethics, and the other anticompetitive Rules discussed above.

278.   Again, the Pee Dee Association REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendant named in paragraph 272 embraced the conspiracy on behalf of the membership by its service on the Board of Directors or as and Officer.

279.   This Defendant further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Piedmont Regional Association of REALTORS**

280.   Defendants eXp Realty and Allen Tate REALTORS have each had at least one member serve as an Officer or Director

of the Piedmont Regional Association of REALTORS.

281.    The Piedmont Regional Association of REALTORS
sold its MLS to Canopy MLS, a large Multiple Listing Service
that, upon information and belief, mirrors the bylaws and rules
and regulations previously discussed in the paragraphs above.
They further, upon information and belief, mirror the model NAR
Rules and Regulations set forth in the Handbook.

282.    Defendants discussed in paragraph 280 and their
co-conspirators, rather than objecting or rejecting the
anticompetitive restraint on trade that the anticompetitive rules
the NAR promulgated, wholeheartedly embraced the price fixing
goal that the conspiracy had at its roots.

283.    Again, the Piedmont Regional Association of
REALTORS and its Board is tasked with enforcing the rules and
regulations of the MLS, to include the Adversary Compensation
Rule as well as the Code of Ethics at issue in this case.

284.    Again, the Defendants discussed in paragraph 280
adopted and enforce those Rules and Regulations, the Code of
Ethics, and the other anticompetitive Rules discussed above.

285.    If Canopy did not enforce substantially similar
Rules and Regulations as required by the National Association of
REALTORS, the Piedmont Association of REALTORS would risk its
certification as a local board of REALTORS.  Indeed, Canopy MLS
is the Defendant in a different suit alleging the same or similar

conduct.

286.   Again, the Piedmont Association of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraphs 280 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

287.   These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Spartanburg Association of REALTORS and Its MLS**

288.   Defendants Ponce Realty Group and eXp Realty have each had at least one member serve as an Officer or Director of the Spartanburg Association of REALTORS or its MLS.

289.   The Multiple Listing Service of Spartanburg is wholly owned and operated by the Spartanburg Association of REALTORS or is otherwise controlled by the Spartanburg Association of REALTORS.

290.   Upon information and belief, the Spartanburg MLS mirrors the bylaws and rules and regulations previously discussed in the paragraphs above.  They further, upon information and belief, mirror the model NAR Rules and Regulations set forth in the Handbook.

291.    Defendants discussed in paragraph 288 and their co-conspirators, rather than objecting or rejecting the anticompetitive restraint on trade that the anticompetitive rules the NAR promulgated, wholeheartedly embraced the price fixing goal that the conspiracy had at its roots.

292.    Again, the Spartanburg Association of REALTORS and its Board is tasked with enforcing the rules and regulations of the MLS, to include the Adversary Compensation Rule.

293.    Again, the Defendants discussed in paragraph 288 adopted and enforce those Rules and Regulations, the Code of Ethics, and the other anticompetitive Rules discussed above.

294.    Again, the Spartanburg Association of REALTORS or its membership, upon information and belief, failed to object to the Handbook as promulgated by the NAR.  Indeed, the REALTOR membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 288 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

295.    These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Sumter Board of REALTORS and Its MLS**

296. Defendant Advantage Realty Group, Lake Homes Realty, LLC., and Home and Land Pros have each had at least one

member serve as an Officer or Director of the Sumter Board of
REALTORS or its MLS.

297.   The Sumter Board of REALTORS MLS is
wholly owned and operated by the Sumter Board of REALTORS or is
otherwise controlled by the Sumter Board of REALTORS.

298.   Upon information and belief, the Sumter MLS
mirrors the bylaws and rules and regulations previously discussed
in the paragraphs above.  They further, upon information and
belief, mirror the model NAR Rules and Regulations set forth in
the Handbook.

299.   Defendants discussed in paragraph 296 and their
co-conspirators, rather than objecting or rejecting the
anticompetitive restraint on trade that the anticompetitive rules
the NAR promulgated, wholeheartedly embraced the price fixing
goal that the conspiracy had at its roots.

300.   Again, the Sumter Board of REALTORS and its Board
is tasked with enforcing the rules and regulations of the MLS, to
include the Adversary Compensation Rule.

301.   Again, the Defendants discussed in paragraph 296
adopted and enforce those Rules and Regulations, the Code of
Ethics, and the other anticompetitive Rules discussed above.

302.   Again, the Sumter Board of REALTORS or its
membership, upon information and belief, failed to object to the
Handbook as promulgated by the NAR.  Indeed, the REALTOR

membership appears to have wholeheartedly embraced the conspiracy as envisioned.  The Defendants named in paragraph 296 embraced the conspiracy on behalf of the membership by their service on the Board of Directors or as Officers.

303.  These Defendants further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**The Western Upstate Board of REALTORS and Its MLS**

304.  Defendants Silver Star Realty, Clardy Real Estate, Axcent Real Estate, Great Homes of South Carolina LLC., HomeServices, and Realty ONE Group have each had at least one member serve as an Officer or Director of the Western Upstate Board of REALTORS or its MLS.

305.  The Western Upstate Board of REALTORS MLS is wholly owned and operated by the Western Upstate Board of REALTORS or is otherwise controlled by the Western Upstate Board of REALTORS.

306.  Upon information and belief, the Western Upstate MLS mirrors the bylaws and rules and regulations previously discussed in the paragraphs above.  They further, upon information and belief, mirror the model NAR Rules and Regulations set forth in the Handbook.

307.  Defendants discussed in paragraph 304 and their co-conspirators, rather than objecting or rejecting the

anticompetitive restraint on trade that the anticompetitive rules
the NAR promulgated, wholeheartedly embraced the price fixing
goal that the conspiracy had at its roots.

308.  Again, the Western Upstate Board of REALTORS and
its Board is tasked with enforcing the rules and regulations of
the MLS, to include the Adversary Compensation Rule.

309.  Again, the Defendants discussed in paragraph 304
adopted and enforce those Rules and Regulations, the Code of
Ethics, and the other anticompetitive Rules discussed above.

310.  These Defendants further benefited from the
conspiracy by receiving supra market commissions as the
conspiracy intended.

**The Central Carolina Association of REALTORS and Consolidated MLS**

311. Defendant the ART of Real Estate has had at least
one member serve as an Officer or Director of the Central
Carolina Association of REALTORS.

312.  The Palmetto MLS is wholly owned and operated by
the Central Carolina Association of REALTORS or is otherwise
controlled by the Central Carolina Association of REALTORS.

313.  Upon information and belief, the Palmetto MLS
mirrors the bylaws and rules and regulations previously discussed
in the paragraphs above.  They further, upon information and
belief, mirror the model NAR Rules and Regulations set forth in
the Handbook.

314. Defendant discussed in paragraph 311 and its co-conspirators, rather than objecting or rejecting the anticompetitive restraint on trade that the anticompetitive rules the NAR promulgated, wholeheartedly embraced the price fixing goal that the conspiracy had at its roots.

315. Again, the Central Carolina Association of REALTORS and its Board is tasked with enforcing the rules and regulations of the MLS, to include the Adversary Compensation Rule.

316. Again, the Defendant discussed in paragraph 311 adopted and enforce those Rules and Regulations, the Code of Ethics, and the other anticompetitive Rules discussed above.

317. In addition to the Palmetto MLS, there exists in that same region the Consolidated MLS. The Consolidated MLS, while formally separate from the South Carolina Association of REALTORS, does still appear on the website of the South Carolina Association of REALTORS.

318. The Central Carolina Association of REALTORS Board is still obligated to discipline members for Code of Ethics violations that occur.

319. The Central Carolina Association of REALTORS further has caused the Consolidated Multiple Listing Service to follow the same or substantially the same rules and regulations set forth by the Handbook.

320. The Consolidated MLS Rules and Regulations and Bylaws, upon information and belief, largely match the format and content of the Handbook, as well.

321. As a practical matter, the Board of Directors of the subscribers of the Consolidated MLS and the membership of the Central Carolina Association of REALTORS is very nearly the same group of people, people bound to certain obligations by their membership in and association with the National Association of REALTORS.

322. The price fixing conspiracy to which the NAR has invited Defendant discussed in paragraph 311 and the other co-conspirators is still able to flourish because the anticompetitive practices championed by the NAR are still enforced by the Central Carolina Association of REALTORS and the Consolidated MLS.

323. This Defendant further benefited from the conspiracy by receiving supra market commissions as the conspiracy intended.

**Statewide Actions**

324. Agency Defendants Bluefield Realty Group, Carriage Properties, LLC., Defendants LPT and Jeff Cook Enterprises, Hanna Holdings, @World Properties, Litchfield Company Real Estate, and Fathom Realty Holdings, LLC have each engaged in and benefitted from the conspiracy by forcing their

seller clients to offer supra market buyer broker commissions and by accepting supra market buyer broker commissions.

325.  Each of the Agency Defendants, to include but not be limited to those discussed in paragraph 324, have ensured that commissions would settle at between 5 and 6 percent of the sales price of a home.  They have done this by availing themselves of the framework provided by the NAR Rules and other measures complained of herein.

326.  Further, each of the Agency Defendants, to include but not be limited to those discussed in paragraph 324 have done this while using the threat of potential disciplinary action from the NAR, state, and local boards to ensure that they were able to profit from the conspiracy.

327.  The framework created by NAR in its Rules and Regulations, Code of Ethics, and Interpretations, was used by the Agency Defendants to combine, contract, and conspire to ensure that a standard commission between five and six percent of the sales price of a home by sellers of homes, that that commission would be split more or less evenly between the seller's and buyer's brokers, and to blacklist those agencies that attempted to subvert that standard commission.

**EFFECTS OF THE CONSPIRACY**

328. Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which the

MLSs that comprise the real estate market in the District of South Carolina operate:

   a.   Home sellers have been forced to pay commissions to buyer brokers- who represent their adversaries in negotiations to sell their homes – thereby substantially inflating the cost of selling their homes;

   b.   Home sellers have been compelled to set a high buyer-broker commission to induce buyer brokers to show their homes to the buyer broker's clients;

   c.   By paying inflated buyer broker commissions, home sellers have paid inflated total commissions;

   d.   The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker while the home seller's agent sets the buyer broker's compensation;

   e.   Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes;

   f.   Buyer broker compensation is insensitive to factors a competitive market would place value on, like experience, level of service, and local

connections, instead being set by the sales price of the house purchased and the "customary" percentage buyer commission offered;

g.    Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission;

h.    The agency conspirators and their franchisees have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions;

i.    Home sellers have been forced to purchase services they do not want, the services of an unidentified buyer broker, at the time they purchase services that they do want, the services of a seller broker with access to the local geographic MLS;

j.    Commissions have been removed as part of the negotiating process between seller and buyer, as they are now a take-it-or-leave-it proposition.

329. Plaintiffs are not aware of any pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition. The Defendants' conspiracy is simply an attempt to perpetuate the previous, historical system that also required the home seller to pay the commission of the buyer broker.

330. To the extent Defendants argue that the MLS system itself has certain pro-competitive benefits, none of these benefits derive from the anticompetitive rules and regulations promulgated by the NAR and enforced at the state and local level to protect the inflated commissions of buyer brokers.

331. Even if some alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

332. Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer broker commissions paid by home sellers, at levels above what similarly developed markets without the anticompetitive effects of the NAR's policies have.

333. Compared to other countries with competitive markets for residential real estate brokerage services, the commission in the MLSs that comprise the real estate market of the District of South Carolina are substantially higher. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States. This article is attached as Exhibit 4.

334. Delcoure and Miller concluded that "most of the other highly industrialized nations" had much lower total residential commission rates, with the UK seeing a total commission rate of less than 2%, 3.14 % in New Zealand and South

Africa, and a total commission rate of around 3% in Singapore.

335. These economists also found that, in particularly competitive areas of the UK, total commission rates ran as low as half to three quarters of a percent, but could be as high as 3.5%. This makes sense, as the market in each of those areas is sensitive to competitive factors, unlike the markets of the District of South Carolina.

336. Delcoure and Miller ultimately found that US residential brokerage fees should run closer to 3% than the 5-6% at which they currently run.

337. Other economists have reached similar conclusions. A Professor of Economics at Cornell University has described the Adversary Commission Rule as a "structural hurdle" preventing innovation and price competition in the real estate market. This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of the United States or the District of South Carolina's real estate market.

338. The Adversary Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. A National Real Estate brand, through material prepared for its sales program used to train REALTORS, has boasted that standard real estate commissions have stabilized at six per cent. The

Adversary Commission Rule enables buyer brokers to identify and
compare the buyer broker compensation offered by every seller in
the MLSs that comprise the real estate market of the District of
South Carolina and then steer their client toward home offering
higher commissions.  Agency Defendants have trained seller
brokers to persuade home sellers not to reduce the buyer broker
commission to be offered and do so on the presumption that
steering is widespread and will occur.

339. Further, by requiring the seller to make a
unilateral blanket offer of compensation to a buyer broker, that
buyer broker, who owes duties of good faith and fair dealing to
his client the buyer, is incentivized to steer his client to a
more expensive house because his commission in real dollars will
increase with the purchase price of the house.

340. The practice of steering, confirmed by the
economic literature and by Defendants' own training materials,
has manifest anticompetitive effects.  Steering deters reductions
from the "standard" commission and enables brokers to avoid doing
business with, or to retaliate against, buyer brokers who try to
compete by offering discounts.  Steering also creates significant
agency costs by misaligning the buyer broker's incentives and the
best interests of the buyer broker's client.

341. The Agency Conspirators, and their franchisees and
brokers and other co-conspirators, also use software technology

to help facilitate steering based on MLS commission information. They have further taken actions to prevent buyers from learning about properties that offer discount buyer broker commissions.

342. CoreLogic is a software technology company that provides software and data services to many MLSs around the country and, upon information and belief, to the NAR MLSs that comprise the real estate market of the District of South Carolina.  The software program is called Matrix.

343. Matrix has feature that allow brokers to filter listings by the buyer broker commission being offered, which means that the buyer broker can use Matrix to ensure that his or her clients only receive information about potential homes offering buyer broker commission in a desired range.

344. In addition, NAR has enacted certain other rules and policies – which the Agency Defendants and their conspirators have helped draft and then abided by, agreed to, and implemented – that further exacerbate the anticompetitive effect of steering. The offered buyer broker commission is specified in only certain ways to make it easy for REALTOR participants to see and compare those commission rates.

345. Defendants have ensured that, while REALTORS may easily find information regarding buyer broker commission offers, regular home buyers and sellers may not be able to see that information.

346. The economic evidence is plain that the Adversary Commission Rule works to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise should.

347. Defendants' conspiracy and the Adversary Commission Rule was designed to keep real estate commissions at elevated, supra-market levels, and Defendants have managed to keep the "standard" commission between 5 and 6 percent, despite significant social and technological changes that should have driven those cost down substantially.

348. Moreover, Defendants' conspiracy and the Adversary Commission Rule was designed to keep real estate agents who otherwise would not have been competitive in business. By providing a "standard" commission, buyer brokers are not subject to the rigors of the marketplace and, thus, inefficient agents are not forced either to become competitive or go out of business.

349. This conspiracy, the Adversary Commission Rule, and the tying of buyer broker services to seller broker services, shelters real estate agents who are not able to compete in the market on those terms the market would consider favorable – price, experience, actual work performed, levels of service, etc..

**RELEVANT MARKETS AND DEFENDANTS' MARKET POWER**

350. The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to the MLSs that comprise the real estate market of the District of South Carolina.

351. Defendants' control of the MLSs that comprise the real estate market of the District of South Carolina allows Defendants to impose the Adversary Commission Rule and other anticompetitive NAR rules on Class members and other market participants. Access to the MLSs that comprise the real estate market of the District of South Carolina is critical for brokers to compete and to assist home buyers and sellers in the District of South Carolina.

352. The relevant geographic markets for the claims asserted herein is the District of South Carolina wherein the MLSs that comprise the real estate market of South Carolina operate. Nearly all homes sold in these geographic areas were listed on those MLSs by brokers that are subject to the MLS and NAR rules and standards.

353. Buyers and Sellers generally work with local real estate agents who are members of the local MLS where the property to be bought or sold is located.

354. The Agency Defendants collectively have market power in each relevant market through their control of the local

MLS, the local REALTOR boards, and/or their dominant share of the local market.

355. Any buyer brokers in the areas in which the MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' effective control of the MLSs that comprise the real estate markets of the District of South Carolina through their co-conspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

356. A seller's broker without access to a listing service like the MLSs that comprise the real estate market of the District of South Carolina would be unable to reach the large majority of potential buyers and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

357. For an alternative listing service to effectively compete with one of the MLSs subject to the NAR's rules, the alternative listing service would need to have listings as comprehensive as (or at least nearly so) as the MLS subject to the NAR's rules. But brokers and their individual REALTORS or agents who currently profit from inflated buyer broker

commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions.

358. Further, many buyers would be reluctant now to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission when other buyer brokers operating on an MLS subject to the NAR's rules are entirely compensated by home sellers.

359. Lastly, the Defendants would not allow such an alternative listing service to exist. The Agency Defendants would not allow their listings to appear on such an alternative listing service and the NAR, by and through its local affiliates, would not provide those listing on such a service professional liability insurance. In other words, many of the current agents listing on the MLSs that comprise the real estate market of the District of South Carolina would be immediately shorn of the many services provided to them by the Defendants and be forced either to fly or fall in a brave but dangerous world totally unlike the safe, relatively uncompetitive one in which they currently live. Indeed, this is the dynamic that has played out in the privately held MLSs in the State of South Carolina as discussed above.

360. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that

had no track record of success and had failed to attract
sufficient buyers and buyer brokers.  Any listing service
attempting to compete with any of the existing MLSs that comprise
the real estate market of the District of South Carolina would
likely fail to attract enough property listings to operate
profitably and be a competitive constraint on the incumbent MLSs.
The absence of listing services that compete with the existing
MLSs that comprise the real estate market of the District of
South Carolina without adhering substantially to the
anticompetitive rules discussed herein reflects these and the
above discussed barriers to entry.

361. As an additional impediment to potential
competition, NAR advises MLSs to enter into non-compete
agreements with third-party websites so that those websites do
not become competitive rivals to MLSs.  NAR's checklist of
"critical components" states that the consumer-facing website
"must agree they will not compete with the brokerage firms or MLS
by either becoming a licensed brokerage firm or by providing
offers of cooperation and compensations."  The non-compete
agreement requires the consumer-facing website to agree not to
"use the data in a manner that is similar to a Multiple Listing
Service."  NAR has thus advised MLSs to take affirmative steps to
further the conspiracy by preventing third party websites from
becoming possible competitors.

362. NAR has also previously taken actions to stifle innovation and competition among real estate brokers, including actions which have led the Antitrust Division of the Department of Justice to file a number of lawsuits over the years in which the NAR has repeatedly either agreed to change the policies at issue or been found to be acting under explicit price fixing arrangements.

**CONTINUOUS ACCRUAL**

363. During the four years preceding the filing of this Complaint, Agency Defendants and their co-conspirator brokers in the MLSs that comprise the real estate market of the District of South Carolina, repeatedly charged and received buyer broker commissions and total commissions that were inflated as a result of the conspiracy.

364. These inflated commissions during the preceding four years were paid by Plaintiffs and the other Class members in connection with the sale of residential real estate listed on one of the MLSs that comprise the real estate market of the District of South Carolina to include the MLS Defendants.

365. Each payment of these inflated commissions by Plaintiffs and the other Class members during the last four years injured them and gave rises to a new cause of action for that injury.

366. During the last four years, Defendants and their

co-conspirators have maintained, implemented, and enforced the Adversary Commission Rule and other anticompetitive NAR rules nationwide, including in the MLSs that comprise the real estate market in the District of South Carolina.

### CLASS ACTION ALLEGATIONS

367. Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of "the South Carolina MLS Class," asserting Count I, defined as:

> All persons who, from November 6, 2019 through the present, used a listing broker in the sale of a home listed on an MLS in the District of South Carolina.

368. Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class is any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

369. The Class is readily ascertainable because records of the relevant transactions should exist.

370. The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the

Class has many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

371. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

372. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

a.   Whether Defendants engaged in the alleged conspiracy;

b.   Whether the conspiracy was implemented in the areas in which the MLSs that comprise the real estate market in the District of South Carolina operate;

c.   Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Class;

d.   Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions in the areas in which the MLSs that

comprise the real estate market in the District of
South Carolina operate;

e.    Whether the competitive harm from the conspiracy
substantially outweighs any competitive benefits;

f.    Whether Plaintiffs and the other members of the
Class are entitled to, among other things,
injunctive relief, and, if so, the nature and
extent of such injunctive relief;

g.    Whether Defendants' conduct is unlawful;

h.    Whether the Agency Defendants exercised control
over local MLSs;

i.    Whether the Agency Defendants' control over local
MLSs extended to disciplining failures to comply
with the Rules and Regulations of those MLSs;

j.    Whether the privately held MLSs followed
substantially similar rules as those affiliated
with the NAR; and

h.    The appropriate class-wide measures of damages.

373. Plaintiffs' claims are typical of the claims of
the members of the Class because their claims arise from the same
course of conduct by Defendants and the relief sought within the
Class is common to each member.

374. Plaintiffs have retained counsel competent and
experienced in the prosecution of class action litigation to

represent themselves and the Class. Together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

375. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

376. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## **ANTITRUST INJURY**

377. Defendants' anticompetitive agreements and conduct have had the following effects, among others discussed above:

a.   Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

b.   Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

c.   Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers;

d.   Home sellers have been forced to purchase services

that they did not want, namely buyer broker
services, in exchange for buying services that
they did want, namely seller broker services; and

e.    The Agency Defendants and their franchisees have
inflated their profits by a significant margin by
the increased total commission and increased buyer
broker commissions;

378. By reason of the violations of antitrust laws,
Plaintiffs and the Class have sustained injury to their business
or property, having paid higher total commissions than they would
have paid in the absence of Defendants' anticompetitive
conspiracy and, as a result, have suffered damages.

379. There are no pro-competitive effects of the
Defendants' conspiracy that are not substantially outweighed by
the conspiracy's anticompetitive effects.

380. Significant economic evidence supports concluding
that Defendants' conspiracy has resulted in Class members paying
buyer broker commissions and total commission that have been
inflated to a supra-market level in the areas in which the NAR
MLSs that comprise the real estate market of the District of
South Carolina operate.

381. This is an antitrust injury of the type that the
antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

### COUNT ONE:
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### Against All Defendants

382. Plaintiffs reallege and incorporate by reference each paragraph above as if repeated verbatim herein.

383. Beginning more than four years before the filing of this Complaint and continuing to the present day and likely to continue unless and until an injunction is issued in this case, Defendants engaged in, and continue to engage in, a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

384. The conspiracy herein alleged consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

385. In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a. Participated in the creation, maintenance, re-publication, implementation, and enforcement of the Adversary Commission Rule and other anticompetitive NAR rules, or substantially

similar Rules within the MLS Defendants;

b.    Participated in the establishment, maintenance, implementation, and enforcement of rules by local NAR associations and MLSs both NAR and non-NAR affiliated that implemented the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which the MLSs that comprise the real estate market of the District of South Carolina operate;

c.    Requiring franchisees and others to implement the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which the MLSs that comprise the real estate market of the District of South Carolina operate, which each Agency Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and REALTORS; and

d.    Engaged in practices to fix the standard commission at between five and six percent of the sales price of the homes sold and require sellers to pay the buyer broker commissions.

386. Defendants' conspiracy has required sellers to pay buyer brokers, to pay those buyer brokers an inflated commission

and an inflated total commission, and it has restrained price competition among buyer brokers in the areas in which the MLSs that comprise the real estate market of the District of South Carolina operate. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

387. Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the MLSs that comprise the real estate market of the District of South Carolina operate to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on one of the MLSs that comprise the real estate market of the District of South Carolina. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer and, to the extent the seller obligated herself to pay the buyer broker, that price would have been the subject of negotiation between the seller and the buyer.

388. Defendants' conspiracy is a per se violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

389. In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

390. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests relief and prays for judgment against Defendants as follows:

A.   An Order certifying the Class under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Class;

B. Declarations that the actions of Defendants, as set forth above, are unlawful;

C. A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from:

(1)   requiring that sellers pay the buyer broker,

(2)   continuing to restrict competition among buyer brokers and seller brokers, and

(3)   engaging in any conduct determined to be unlawful;

D. Appropriate injunctive and equitable relief;

E. An award to Plaintiffs and the other members of the

Class for damages and/or restitution in an amount to be determined at trial;

F. An award of pre- and post-judgment interest to Plaintiffs;

G. An award to Plaintiffs for their costs of suit, including reasonable attorneys' fees and expenses;

H. An award of such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial of all issues so triable.

***Signature Page to Follow***

KNIE & SHEALY

*/s/ Patrick E. Knie*

Patrick E. Knie
Federal I.D. No. 2370
Matthew W. Shealy
Federal I.D. No. 12823
P.O. Box 5159
250 Magnolia Street
Spartanburg, S.C.  29304
Telephone No.  (864) 582-5118
Telefax No.    (864) 585-1615
pat@knieshealy.com
matt@knieshealy.com


Mitch Slade
MITCH SLADE LAW OFFICE, P.A.
Federal I.D. No. 5352
P.O. Box 1007
Spartanburg, S.C.  29304
Telephone: (864) 582-4212
mitch@mitchsladelaw.com


ATTORNEYS FOR PLAINTIFFS

April 10, 2024